**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MALLORY KIRKLAND**, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br>v.<br><br>**JAMES H. CUNNINGHAM INSURANCE AGENCY, INC. d/b/a CUNNINGHAM GROUP**,<br><br>Defendant. | Case No. 1:25-cv-10730<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Mallory Kirkland ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this Class Action Complaint against Defendant James H. Cunningham Insurance Agency, Inc. d/b/a Cunningham Group ("Defendant"), alleging as follows based upon personal knowledge, information and belief, and investigation of counsel.

## NATURE OF THE ACTION

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard Plaintiff's and Class Members' protected health information ("PHI") and personally identifying information ("PII"), and the preventable data breach of Defendant's inadequately protected computer systems.

2. Between September 6, 2024, and September 13, 2024, cybercriminals hacked into Defendant's computer network systems and stole Plaintiff's and Class Members' sensitive, confidential PHI and PII stored therein, including their name, date of birth, and health information,

(collectively, "Private Information"), causing widespread injuries to Plaintiff and Class Members (the "Data Breach"). [1]

3. Defendant is "the largest independent insurance agency in the nation, specializing in the delivery of innovative insurance and risk management solutions to physician practices."[2]

4. Plaintiff and Class Members are current and former clients of Defendant who, in order to obtain insurance services from Defendant, were and are required to entrust Defendant with their sensitive, non-public Private Information. Defendant could not perform its operations or provide its services without collecting Plaintiff's and Class Members' Private Information and retains it for many years, at least, even after the client-provider relationship has ended.

5. Insurance providers like Defendant that handle Private Information owe the clients to whom that data relates a duty to adopt reasonable measures to protect such information from disclosure to unauthorized third parties, and to keep it safe and confidential. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiff and Class Members, and because it is foreseeable that the exposure of Private Information to unauthorized persons—and especially hackers with nefarious intentions—will harm the affected individuals, including but not limited to by the invasion of their private information and financial matters.

6. Defendant breached these duties owed to Plaintiff and Class Members by failing to safeguard their Private Information they collected and maintained, including by failing to implement industry standards for data security to protect against cyberattacks, which failures allowed criminal hackers to access and steal clients' Private Information from Defendant's care.

---

[1] *See* Defendant's Notice Letter sent to Plaintiff, attached hereto as **Exhibit A**.
[2] *See* http://www.linkedin.com/company/cunningham-group/about/.

7. While the full extent of the Private Information exposed and exfiltrated in the Data Breach is currently unknown, upon information and belief, given the extent of Defendant's client network, at least thousands if not more of Defendant's current and former clients were affected.

8. According to Defendant's notice to victims of the Data Breach ("Notice Letter"), on or around September 10, 2024, Defendant discovered suspicious activity on its computer network, and on or around May 14, 2025, Defendant discovered that Plaintiff's personal information had been acquired by unauthorized third parties.[3]

9. Defendant failed to adequately protect Plaintiff's and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive data. This unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect its clients' sensitive information details.

10. Defendant maintained the Private Information in a reckless manner. In particular, Private Information was maintained on and/or accessible from Defendant's network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus, Defendant knew that failing to take reasonable steps to secure the Private Information left it in a dangerous condition.

11. Hackers targeted and obtained Plaintiff's and Class Members' Private Information from Defendant because of the data's value in exploiting and stealing identities. As a direct and proximate result of Defendant's inadequate data security and breaches of its duties to handle Private Information with reasonable care, Plaintiff's and Class Members' Private Information has been accessed by hackers and exposed to an untold number of unauthorized individuals. The

[3] *See* Ex. A.

present and continuing risk to Plaintiff and Class Members as victims of the Data Breach will remain for their respective lifetimes.

12. The harm resulting from a cyberattack like this Data Breach manifests in numerous ways including identity theft and financial fraud, and the exposure of an individual's Private Information due to a data breach ensures that the individual will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of his or her life. Mitigating that risk, to the extent it is even possible to do so, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take several additional prophylactic measures.

13. As a result of the Data Breach, Plaintiff and Class Members suffered concrete injuries in fact, including but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of privacy; (h) emotional distress including anxiety and stress in with dealing with the Data Breach; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect the patient data it collects and maintains.

14. To recover from Defendant for these harms, Plaintiff, on her own behalf and on behalf of the Class as defined herein, brings claims for negligence/negligence *per se*, breach of implied contract, invasion of privacy, and unjust enrichment, to address Defendant's inadequate safeguarding of Plaintiff's and Class Members' Private Information in its care.

15. Plaintiff and Class Members seek damages and equitable/injunctive relief requiring Defendant to (a) disclose the full nature of the Data Breach and types of Private Information exposed; (b) implement data security practices to reasonably guard against future breaches; and (c) provide, at Defendant's expense, all Data Breach victims with lifetime identity theft protection services.

## PARTIES

### *Plaintiff Mallory Kirkland*

16. Plaintiff is an adult individual who at all relevant times has been a citizen and resident of Cordova, Tennessee.

17. Plaintiff is a client of Defendant, having obtained life insurance services from Defendant prior to the Data Breach.

18. As a condition of receiving insurance services from Defendant, Plaintiff was required to entrust Defendant with her Private Information.

19. Plaintiff greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

20. Plaintiff would not have provided her Private Information to Defendant had she known it would be kept using inadequate data security and vulnerable to a cyberattack.

21. At the time of the Data Breach—in or around September 2024—Defendant retained Plaintiff's Private Information in its network systems with inadequate data security, causing Plaintiff's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

22. On or about August 25, 2025, Plaintiff received Defendant's Notice Letter informing that her Private Information was accessed and exposed to unknown, unauthorized cybercriminals through the Data Breach. According to the Notice Letter, hackers gained access to Defendant's computer network systems at some point between September 6, 2024, and September 13, 2024, and acquired files containing Plaintiff's sensitive Private Information, including her name, date of birth, and health information.

23. Plaintiff further believes her Private Information stolen in the Data Breach, and that of Class Members, was and will be sold and further disseminated on the dark web as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type. The risk of identity theft is thus impending and has materialized.

24. Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud, valuable time she otherwise would have spent on other activities.

25. Plaintiff further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

26. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress about the genuine and imminent risk of identity theft facing her, and her sensitive data's publication on the dark web, which is compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence or the information stolen.

27. Moreover, following the Data Breach, Plaintiff has experienced suspicious spam robocalls and texts using her Private Information, and believes this be an attempt to secure additional Private Information from her.

28. Due to Defendant's inadequate data security practices, the resulting Data Breach, and the foreseeable consequence of Plaintiff's confidential Private Information ending up in the hands of cybercriminals, Plaintiff has suffered and will continue to suffer numerous, substantial injuries including but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) deprivation of value of her Private Information; (f) invasion of privacy; and (g) the continued risk to her Private Information, which remains backed up in Defendant's possession and subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information it collects and maintains.

***Defendant James H Cunningham Insurance Agency Inc.***

29. Defendant is a domestic corporation that has its headquarters located in Elmwood Park, Illinois. Defendant's registered agent, John B Turcza, can be found at 7234 West North Avenue, Suite 101, Elmwood Park, Illinois 60707.

## JURISDICTION AND VENUE

30. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom, including Plaintiff, have different citizenship from Defendant. Thus, minimal diversity

exists under 28 U.S.C. § 1332(d)(2)(A).

31. This Court has personal jurisdiction over Defendant because they operate in this District, have their headquarters in this District and conducts substantia business in this District.

32. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant maintains substantial operations in this District, Defendant has its headquarters in this District, and Defendant has harmed Class Members residing in this District.

## FACTUAL BACKGROUND

### A. Defendant Owed Duties to Adopt Reasonable Data Security Measures for Private Information it Collected and Maintained.

33. Defendant is "the largest independent insurance agency in the nation, specializing in the delivery of innovative insurance and risk management solutions to physician practices."[4]

34. Defendant's specialties include but are not limited to "medical malpractice, insurance for healthcare professionals, insurance for doctors, medical malpractice insurance, Tail malpractice coverage, medical malpractice insurance rates by state, healthcare matters, ALL MD, Errors & Omissions, E&O Coverage, Lawyer E&O Insurance Coverage, and Attorney Errors & Omissions."[5]

35. Plaintiff and Class Members are current and former clients of Defendant who received insurance services from Defendant prior to September 2024.

36. As a condition and in exchange for receiving insurance services from Defendant, Defendant's clients, including Plaintiff and Class Members, were required to entrust Defendant with highly sensitive Private Information.

---

[4] *See* http://www.linkedin.com/company/cunningham-group/about/ (last visited Sept. 5, 2025).

[5] *Id*.

37. In exchange for receiving Plaintiff's and Class Members' Private Information, Defendant promised to safeguard the sensitive, confidential data and use it only for authorized and legitimate purposes in its privacy policy posted on its website.[6]

38. Defendant's privacy policy posted on its website states, in relevant part:

> **How do we protect your information?**
>
> We implement a variety of security measures to maintain the safety of your personal information when you enter, submit, or access your personal information.
>
> We are very aware of the ransomware attacks taking place across all industries and we pledge to everything we can to protect your information.[7]

39. The information Defendant held in its computer networks at the time of the Data Breach included the unencrypted Private Information of Plaintiff and Class Members.

40. At all relevant times, Defendant knew it was storing and using its networks to store and transmit valuable, sensitive Private Information belonging to Plaintiff and Class Members, and that as a result, its systems would be attractive targets for cybercriminals.

41. Defendant also knew that any breach of its information technology network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the individuals whose Private Information was compromised, as well as intrusion into those individuals' highly private medical information.

42. Defendant is and was required by law to provide the aforementioned Notice of Privacy Practices to all clients receiving insurance services from Defendant. Upon information and belief, Defendant provided the Notice of Privacy Practices to Plaintiff and Class Members prior to them entrusting their Private Information to Defendant.

---

[6] http://www.cunninghamgroupins.com/about-cunningham-group/privacy-policy/.

[7] *Id*.

43. Plaintiff and Class Members relied on these promises from Defendant, a sophisticated business entity and insurance provider, to implement reasonable practices to keep their sensitive Private Information confidential and securely maintained, to use this information for necessary purposes only and make only authorized disclosures of this information, and to delete Private Information from Defendant's systems when no longer necessary for its legitimate business or insurance purposes.

44. But for Defendant's promises to keep Plaintiff's and Class Members' Private Information secure and confidential, Plaintiff and Class Members would not have sought services from or entrusted their Private Information to Defendant. Clients and consumers, in general, demand security to safeguard their Private Information, especially when sensitive information is involved.

45. Based on the foregoing representations and warranties and to obtain services from Defendant, Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its promises and obligations to keep such information confidential and protected against unauthorized access.

46. Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information. To that end, Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

47. Defendant derived economic benefits from collecting Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Defendant could not perform its operations, furnish the services it provides, or receive payment for those services.

48. By obtaining, using, and benefiting from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting that Private Information from unauthorized access and disclosure.

49. Defendant had and have a duty to adopt reasonable measures to keep Plaintiff's and Class Members' Private Information confidential and protected from involuntary disclosure to third parties, and to audit, monitor, and verify the integrity of its IT network systems.

50. Additionally, Defendant had and has obligations created by the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45 ("FTC Act"), common law, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and protected from unauthorized disclosure. Defendant failed to do so.

**B. Defendant Failed to Adequately Safeguard Plaintiff's and Class Member's Private Information, Causing the Data Breach.**

51. On or about August 25, 2025, Defendant began sending Plaintiff and other Data Breach victims the Notice Letters.

52. Plaintiff's Notice Letter informs as follows, in part:

> **<u>What Happened?</u>**
> On September 10, 2024, Cunningham Group became aware of suspicious activity on its computer network. Upon detecting suspicious activity, Cunningham Group promptly secured its network, notified law enforcement, and began an investigation with the help of leading cybersecurity experts. The investigation determined that an unknown, unauthorized party accessed Cunningham Group's network between September 6, 2024, and September 13, 2024, and may have acquired certain files from Cunningham Group's systems.
> **<u>What We Are Doing.</u>**
> In addition to the actions described above, we are taking steps to reduce the risk of this type of incident occurring in the future, including enhancing our technical safeguards. We are also notifying you of the incident so at you can be aware and take steps to protect your information, if you feel it appropriate to do so.
> **<u>What Information Was Involved?</u>**
> We reviewed the contents of the files that may have been acquired without authorization during the incident. On May 14, 2025, we determined that the files contained your name in combination with your date of birth and health information.

> **<u>What You Can Do.</u>**
> While we have no evidence that your personal information has been misused, we encourage you to view the information on steps to protect yourself against possible identity theft or fraud in the enclosed Additional Important Information sheet.[8]

53. Omitted from the Notice Letter were the details of the root cause of the Data Breach and the vulnerabilities exploited. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

54. Thus, Defendant's purported "disclosure" to Data Breach victims amounts to no real disclosure at all, as it fails to inform Plaintiff and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach was severely diminished.

55. While Defendant became aware of the Data Breach no later than September 10, 2024, it took approximately eleven months for Defendant to notify impacted individuals of the breach.

56. As the Data Breach evidences, Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive Private Information it collected and maintained from Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer needed, training employees to recognize and guard against cyberattacks, and implementing appropriate logging and alerting measures to promptly detect unauthorized access if it occurs. These failures by Defendant allowed and caused cybercriminals to target Defendant's electronic heath record vendor's network, carry out the Data Breach, continue accessing Defendant's systems for days even after detection, and extract unencrypted files with

---

[8] *See* Ex. A.

Plaintiff and Class Member's Private Information.

57. Plaintiff's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Criminal hackers accessed and acquired confidential files containing Plaintiff's and Class Members' Private Information from Defendant's systems, where they were kept without adequate safeguards and in unencrypted form.

58. Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing Plaintiff's and Class Members' Private Information, but failed to do so, causing the Data Breach.

59. Defendant's tortious conduct and breach of contractual obligations, as detailed herein, are evidenced by its failure to recognize the Data Breach until cybercriminals had already accessed Plaintiff's and Class Members' Private Information, meaning Defendant had no effective means in place to ensure that cyberattacks were detected and prevented.

**C. Defendant Knew of the Risk of a Cyberattack because Insurance Providers in Possession of Private Information are Particularly Suspectable.**

60. Defendant's negligence in failing to safeguard Plaintiff's and Class Members' Private Information is exacerbated by the repeated warnings and alerts directed to protecting and securing such data.

61. Private Information of the kind accessed in the Data Breach is of great value to hackers and cybercriminals as it can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the dark web.

62. Private Information can also be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and financial records. This may be accomplished alone or in combination with other PII or PHI connected or linked to an individual, such as his or her birthdate, birthplace, and mother's maiden name.

63. Data thieves regularly target entities in the insurance industry like Defendant due to the highly sensitive information that such entities maintain. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

64. Cyber-attacks against institutions such as Defendant are targeted and frequent. According to Contrast Security's 2023 report *Cyber Bank Heists: Threats to the financial sector*, "Over the past year, attacks have included banking trojans, ransomware, account takeover, theft of client data and cybercrime cartels deploying 'trojanized' finance apps to deliver malware in spear-phishing campaigns."[9] In fact, "40% [of financial institutions] have been victimized by a ransomware attack."[10]

65. In light of past high profile data breaches at industry-leading companies, including, for example, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or, if acting as a reasonable insurance provider, should have known that the Private Information it collected and maintained would be vulnerable to and targeted by cybercriminals.

66. According to the Identity Theft Resource Center's report covering the year 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506)

---

[9] Contrast Security, "Cyber Bank Heists: Threats to the financial sector," pg. 5, avail. at http://www.contrastsecurity.com/hubfs/Cyber%20Bank%20Heists%20Report%2020 23.pdf?hsLang=en (last acc. Sept. 5, 2025).

[10] *Id.*, at 15.

set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[11]

67. The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant itself. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[12]

68. Defendant's data security obligations were particularly important given the substantial increase, preceding the date of the subject Data Breach, in cyberattacks and/or data breaches targeting insurance entities like Defendant that collect and store PII.

69. A complete identity theft kit with health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[13]

70. Given the nature of the Data Breach, it was foreseeable that Plaintiff's and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiff's and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiff's and Class Members' names.

71. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its network server(s), amounting to hundreds of thousands of

[11] *See* "Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises," Jan. 24, 2022, available at http://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data- breach-report-sets-new-record-for-number-of-compromises/ (last accessed Sept. 5, 2025).

[12] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at http://www.ibm.com/reports/data-breach (last accessed Sept. 5, 2025).

[13] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key findings from The Global State of Information Security® Survey 2015: http://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the unauthorized exposure of that unencrypted data.

72. Plaintiff and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

73. As an insurance entity in possession of its clients' PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. Such consequences include the significant costs imposed on Plaintiff and Class Members due to a breach. Nevertheless, Defendant failed to take adequate measures to prevent the Data Breach despite knowing the risk such failure would cause.

74. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and the like.

**D. Defendant was Required but Failed to Comply with FTC Rules and Guidance.**

75. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

76. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses like Defendant. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored

on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[14]

77. The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[15]

78. The FTC further recommends that companies not maintain confidential personal information, like Private Information, longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

79. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like Defendant must undertake to meet their data security obligations.

80. Such FTC enforcement actions include actions against insurance entities like Defendant. *See, e.g., In the Matter of LabMD, Inc*., 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data

[14] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (2016),http://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Sept. 5, 2025).
[15] *Id.*

security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

81. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect sensitive personal information, like Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

82. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[16]

83. Defendant failed to properly implement basic data security practices, in violation of its duties under the FTC Act.

84. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

**E. Defendant Failed to Comply with Industry Standards.**

85. A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

[16] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

86. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[17]

87. In addition, the NIST recommends certain practices to safeguard systems,[18] *infra,* such as the following:

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices.

g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

---

[17] *See* Rapid7, "CIS Top 18 Critical Security Controls Solutions," available at http://www.rapid7.com/solutions/compliance/critical-controls/ (last acc. Sept. 5, 2025).
[18] Federal Trade Commission, "Understanding The NIST Cybersecurity Framework," http://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist- framework (last acc. Sept. 5, 2025).

88. Further still, the Cybersecurity & Infrastructure Security Agency makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[19]

89. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

[19] Cybersecurity & Infrastructure Security Agency, "Shields Up: Guidance for Organizations," available at http://www.cisa.gov/shields-guidance-organizations (last visited Sept. 5, 2025).

### F. Defendant Owed Plaintiff and Class Members a Common Law Duty to Safeguard their Private Information.

90. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant's duty owed to Plaintiff and Class Members obligated it to provide reasonable data security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected Plaintiff's and Class Members' Private Information.

91. Defendant owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

92. Defendant owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

93. Defendant owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

94. Defendant owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

95. Defendant owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

96. Defendant failed to take the necessary precautions required to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized disclosure. Defendant's actions and omissions represent a flagrant disregard of Plaintiff's and Class Members' rights.

**G. Plaintiff and Class Members Suffered Common Injuries and Damages due to Defendant's Conduct.**

97. Defendant's failure to implement or maintain adequate data security measures for Plaintiff's and Class Members' Private Information directly and proximately caused injuries to Plaintiff and Class Members by the resulting disclosure of their Private Information in the Data Breach.

98. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

99. Plaintiff and Class Members are also at a continued risk because their Private Information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its clients' Private Information.

100. As a result of Defendant's ineffective and inadequate data security practices, the resulting Data Breach, and the foreseeable consequences of their Private Information ending up in criminals' possession, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including, without limitation, (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of the benefit of their bargain with Defendant; (h) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; and (i) the continued risk to their sensitive Private Information, which remains in

Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information it collects and maintains.

***The Risk of Identity Theft to Plaintiff and Class Members is Present and Ongoing***

101. Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

102. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[20] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[21]

103. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

104. The dark web is an unindexed layer of the internet that requires special software or authentication to access.[22] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web

---

[20] 17 C.F.R. § 248.201 (2013).
[21] *Id.*
[22] *What Is the Dark Web?*, Experian, available at http://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[23] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

105. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[24] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[25] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[26]

106. The unencrypted Private Information of Plaintiff and Class Members has already been published and will end up for further sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class

---

[23] *Id.*

[24] *What is the Dark Web?* – Microsoft 365, available at http://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[25] *Id.; What Is the Dark Web?*, Experian, available at http://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[26] *What is the Dark Web?* – Microsoft 365, available at http://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

Members. Unauthorized individuals can easily access the Plaintiff's and Class Members' Private Information.

107. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

108. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

109. Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[27]

---

[27] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), http://www.ssa.gov/pubs/EN-05-10064.pdf.

110. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[28]

111. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

112. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

[28] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), http://krebsonsecuritv.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Sept. 5, 2025).

113. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

114. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[29]

115. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[30]

116. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[31] Yet, Defendant failed to rapidly report to Plaintiff and the Class that their Private Information was stolen.

117. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

---

[29] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) http://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed Sept. 5, 2025).

[30] *See* http://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.

[31] *Id.*

118. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

119. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

***Loss of Time to Mitigate the Risk of Identify Theft and Fraud***

120. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

121. In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record

122. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate that harm.

123. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

124. These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[32]

125. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

***Diminished Value of Private Information***

126. Personal data like Private Information is a valuable property right.[33] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber

---

[32] *See* Federal Trade Commission, *Identity Theft.gov*, http://www.identitytheft.gov/Steps (last visited Sept. 5, 2025).

[33] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PRIVATE INFORMATION") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PRIVATE INFORMATION, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

127. For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

128. Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data sells on the dark web for $50 and up.[34]

129. An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[35] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[36, 37] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[38]

130. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where holds significant value for the threat actors.

---

[34] http://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content.
[35] http://www.latimes.com/business/story/2019-11-05/column-data-brokers.
[36] http://datacoup.com/.
[37] http://digi.me/what-is-digime/.
[38] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at http://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

131. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

***Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary***

132. To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach.

133. Given the type of targeted attack in this case and sophisticated criminal activity, the type of information involved, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

134. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

135. Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[39] The information

[39] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), http://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as medical histories).

136. Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

137. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

***Loss of Benefit of the Bargain***

138. Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain.

139. When agreeing to provide their Private Information, which was a condition precedent to obtain services from Defendant and paying Defendant, directly or indirectly, for its services, Plaintiff and Class Members, as clients and consumers, understood and expected that they were, in part, paying for services and data security to protect the Private Information they were required to provide.

140. In fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains struck with Defendant.

## CLASS ALLEGATIONS

141. Plaintiff brings this class action under the Federal Rules of Civil Procedure 23(a) and (b)(3) individually and on behalf of all members of the following class:

> All individuals residing in the United States whose Private Information may have been compromised in the Data Breach, including all persons who received a Notice Letter (the "Class").

142. Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

143. Plaintiff hereby reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

144. Numerosity. The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, Defendant is aware of the number of affected individuals based on how many Notice Letters Defendant sent out.

145. Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, or disclosed Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g. Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i. Whether Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j. Whether Defendant's conduct was negligent;

k. Whether Defendant breached implied contracts for adequate data security with Class Members;

l. Whether Defendant was unjustly enriched by retention of the monetary benefits conferred on it by Class Members; and

m. Whether Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

146. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

147. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

148. Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

149. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial and party resources, and protects the rights of each Class Member.

150. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and declaratory relief are appropriate on a class-wide basis.

151. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

a. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

b. Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

c. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

d. Whether Defendant failed to take commercially reasonable steps to safeguard patient Private Information; and

e. Whether adherence to FTC and HIPAA data security requirements and/or industry standard data security measures would have reasonably prevented the Data Breach.

152. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified by Defendant.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE/NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

153. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 152 above as if fully set forth herein.

154. Defendant required Plaintiff and Class Members to submit private, confidential Private Information to Defendant as a condition of receiving insurance services from Defendant.

155. Plaintiff and Class Members provided certain Private Information to Defendant including their names, dates of birth, Social Security numbers, medical records/data, and other sensitive information.

156. Defendant had full knowledge of the sensitivity of the Private Information to which it was entrusted, and the types of harm that Plaintiff and Class Members could and would suffer if

the Private Information was wrongfully disclosed to unauthorized persons. Defendant had a duty to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting their Private Information.

157. Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices by Defendant.

158. Plaintiff and the Class Members had no ability to protect their Private Information in Defendant's possession.

159. By collecting and storing Plaintiff's and Class Members' Private Information in its network systems, Defendant had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the Private Information from theft. Defendant's duty included a responsibility to implement processes by which it could detect if that Private Information was exposed to unauthorized actors and to give prompt notice to those affected in the case of a data breach.

160. Defendant owed a duty to Plaintiff and the Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

161. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its clients, which is recognized by laws and regulations including but not limited to the FTC Act and HIPAA, as well as by the common law. Defendant was able to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a cybersecurity event like this Data Breach, whereas Plaintiff and Class Members were not.

162. Defendant's duty also arose from its position as an insurance provider. Defendant holds itself out as a trusted provider of outpatient medical services and thereby assumes a duty to reasonably protect its clients' Private Information. Indeed, Defendant, as an insurance provider, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members due to the Data Breach.

163. Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

164. Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

165. Pursuant to HIPAA, 42 U.S.C. § 1302d *et seq*., Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

166. Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* 45 C.F.R. § 164.304.

167. Additionally, pursuant to HIPAA, Defendant had a duty to provide notice of the Data Breach within 60 days of discovering it. *See* 42 C.F.R. § 2.16(b); 45 C.F.R. § 164.404(b).

168. Defendant breached its duties to Plaintiff and Class Members under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security

practices to safeguard Plaintiff's and Class Members' Private Information, by failing to encrypt or timely delete the Private Information from its network systems, and by failing to provide notice to Plaintiff and Class Members of the Data Breach until over 60 days after Defendant discovered it.

169. Defendant's violation of the statutes described herein directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiff and Class Members.

170. Plaintiff and Class Members are within the class of persons the FTC Act and HIPAA were intended to protect.

171. The type of harm that resulted from the Data Breach was the type of harm the FTC Act and HIPAA were intended to guard against.

172. Defendant's failure to comply with the FTC Act and HIPAA constitutes negligence *per se.*

173. Defendant's duty to use reasonable care in protecting Plaintiff's and Class Members' Private Information in its possession arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to secure such Private Information.

174. Defendant breached its duties, and was negligent by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b. Failing to adequately train employees on proper cybersecurity protocols;

c. Failing to adequately monitor the security of its networks and systems;

d. Failure to periodically ensure that its network system had plans in place to maintain reasonable data security safeguards;

e. Allowing unauthorized access to Plaintiff's and Class Members' Private Information; and

f. Failing to timely notify Plaintiff and Class Members about the Data Breach so they could take appropriate steps to mitigate their damages.

175. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, the Data Breach would not have occurred or at least would have been mitigated, Plaintiff's and Class Members' Private Information would not have been compromised, and Plaintiff and Class Members' injuries would have been avoided.

176. It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' Private Information would injure Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable to Defendant given the known high frequency of cyber-attacks and data breaches in the insurance industry.

177. It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would cause them one or more types of injuries.

178. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (e) loss of benefit of the bargain; and (f) the continued and certainly increased risk to their Private Information, which (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii)

remains in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

179. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

180. Plaintiff and Class Members are entitled to damages, including compensatory, and nominal damages, in an amount to be proven at trial.

181. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

182. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 152 above as if fully set forth herein.

183. Defendant required Plaintiff and Class Members to provide and entrust their Private Information to Defendant as a condition of and in exchange for receiving insurance services from Defendant.

184. When Plaintiff and Class Members provided their Private Information to Defendant, they entered into implied contracts with Defendant pursuant to which Defendant agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiff and Class Members if and when their Private Information was breached and compromised.

185. Specifically, Plaintiff and Class Members entered into valid and enforceable implied contracts with Defendant when they agreed to provide their Private Information to Defendant in exchange for Defendant's reasonable security for Plaintiff's and Class Members' Private Information.

186. The valid and enforceable implied contracts that Plaintiff and Class Members entered into with Defendant included Defendant's promises to protect Private Information it collected from Plaintiff and Class Members, or created on its own, from unauthorized disclosures. Plaintiff and Class Members provided this Private Information in reliance on Defendant's promises, including those in Defendant's Privacy Policy, set forth *supra*.

187. Under the implied contracts, Defendant promised and was obligated to (a) provide insurance services; and (b) protect Plaintiff's and Class Members' Private Information provided to obtain such services and/or created in connection therewith. In exchange, Plaintiff and Class Members agreed to provide Defendant with payment and their Private Information.

188. Defendant promised and warranted to Plaintiff and Class Members, including through its public-facing privacy documents identified *supra*, to maintain the privacy and confidentiality of the Private Information it collected from Plaintiff and Class Members and to keep such information safeguarded against unauthorized access and disclosure.

189. Defendant's adequate protection of Plaintiff's and Class Members' Private Information was a material aspect of these implied contracts with Defendant.

190. Defendant solicited and invited Plaintiff and Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

191. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with industry standards and relevant laws and regulations, including the FTC Act and HIPAA, as well as industry standards.

192. Plaintiff and Class Members who contracted with Defendant for insurance services including reasonable data protection and provided their Private Information to Defendant reasonably believed and expected that Defendant would adequately employ adequate data security to protect that Private Information.

193. A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their Private Information to Defendant and agreed Defendant would receive payment for, amongst other things, the protection of their Private Information.

194. Plaintiff and Class Members performed their obligations under the contracts when they provided their Private Information and/or payment to Defendant.

195. Defendant materially breached its contractual obligations to protect the Private Information it required Plaintiff and Class Members to provide when that Private Information was unauthorizedly disclosed in the Data Breach due to Defendant's inadequate data security measures and procedures.

196. Defendant further materially breached its contractual obligations, including the implied covenant of good faith and fair dealing, when it failed to promptly notify Plaintiff and Class Members of the Data Breach.

197. Defendant materially breached the terms of its implied contracts, including but not limited to by failing to comply with industry standards or the standards of conduct embodied in

statutes or regulations like Section 5 of the FTC Act and HIPAA, by failing to otherwise protect Plaintiff's and Class Members' Private Information, as set forth *supra*.

198. The Data Breach was a reasonably foreseeable consequence of Defendant's breaches of these implied contracts with Plaintiff and Class Members.

199. As a result of Defendant's failures to fulfill the data security protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains with Defendant, and instead received services of a diminished value compared to that described in the implied contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and that which they received.

200. Had Defendant disclosed that its data security procedures were inadequate or that it did not adhere to industry standards for cybersecurity, neither Plaintiff, Class Members, nor any reasonable person would have contracted with Defendant.

201. Plaintiff and Class Members would not have provided and entrusted their Private Information to Defendant in the absence of the implied contracts between them and Defendant.

202. As a direct and proximate result of Defendant's breach of its implied contracts with Plaintiff and Class Members and the attendant Data Breach, Plaintiff and Class Members have suffered injuries and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they struck with Defendant.

203. Plaintiff and Class Members are entitled to damages in an amount to be proven at trial.

**COUNT III**
**INVASION OF PRIVACY/INSTRUSION UPON SECLUSION**
**(On Behalf of Plaintiff and the Class)**

204. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 152 above as if fully set forth herein.

205. Plaintiff and Class Members had a legitimate expectation of privacy to their Private Information and were entitled to Defendant's protection of this Private Information in its possession against disclosure to unauthorized third parties.

206. Defendant owed a duty to its clients, including Plaintiff and Class Members, to keep their Private Information confidential and secure.

207. Defendant failed to protect Plaintiff's and Class Members' Private Information and instead exposed it to unauthorized persons, a notorious ransomware group, which has already made the Private Information publicly available and disseminated it to thousands of people, including through publishing the data on its dark web leak site, where cybercriminals go to find their next identity theft and extortion victims.

208. Defendant allowed unauthorized third parties access to and examination of the Private Information of Plaintiff and Class Members, by way of Defendant's failure to protect the Private Information through reasonable data security measures.

209. The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiff and Class Members is highly offensive to a reasonable person and represents an intrusion upon Plaintiff's and Class Members' seclusion as well as a public disclosure of private facts.

210. The intrusion was into a place or thing, which was private and is entitled to be private—sensitive and confidential information including private medical diagnoses and laboratory test results.

211. Plaintiff and Class Members disclosed their Private Information to Defendant as a condition of and in exchange for receiving insurance services, but privately with an intention that the Private Information would be kept confidential and protected from unauthorized disclosure. Plaintiff and Class Members reasonably believed such information would be kept private and would not be disclosed without their authorization, given Defendant's promises to that effect.

212. Subsequent to the intrusion, Defendant permitted Plaintiff's and Class Members' data to be published online to countless cybercriminals whose mission is to misuse such information, including through identity theft and extortion.

213. The Data Breach constitutes an intentional or reckless interference by Defendant with Plaintiff's and Class Members' interests in solitude or seclusion, as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

214. Defendant acted with a knowing state of mind when it permitted the Data Breach to occur, because it had actual knowledge that its information security practices were inadequate and insufficient to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure.

215. Defendant acted with reckless disregard for Plaintiff's and Class Members' privacy when it allowed improper access to its systems containing Plaintiff's and Class Members' Private Information without protecting said data from the unauthorized disclosure, or even encrypting such information.

216. Defendant was aware of the potential of a data breach and failed to adequately safeguard its network systems or implement appropriate policies to prevent the unauthorized release of Plaintiff's and Class Members' Private Information to cybercriminals.

217. Because Defendant acted with this knowing state of mind, it had notice and knew that its inadequate and insufficient information security practices would cause injury and harm to Plaintiff and Class Members.

218. As a direct and proximate result of Defendant's acts and omissions set forth above, Plaintiff's and Class Members' Private Information was disclosed to third parties without authorization, causing Plaintiff and Class Members to suffer injuries and damages including, without limitation, (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) out-of-pocket and lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (d) loss of benefit of the bargain; and (e) the continued and certainly increased risk to their Private Information, which remains in Defendant's possession in unencrypted form and subject to further unauthorized disclosures, so long as Defendant fails to undertake appropriate and adequate measures to protect it.

219. Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that the Private Information maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and Class Members.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

220. Plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1 through 152 above, as if fully set forth herein.

221. Plaintiff and Class Members conferred a direct benefit on Defendant by way of providing payment and their confidential and sensitive Private Information to Defendant as part of Defendant's business.

222. Defendant required Plaintiff's and Class Members' Private Information to conduct its business and generate revenue, which it could not do without collecting and maintaining Plaintiff's and Class Members' Private Information.

223. The monies Plaintiff and Class Members paid to Defendant included a premium for Defendant's cybersecurity obligations and were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiff's and Class Members' Private Information.

224. Defendant benefitted from collecting and using Plaintiff's and Class Members' Private Information, using it to generate revenue and market its services.

225. Defendant enriched itself by hoarding the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheap, ineffective security measures and diverting those funds to its own personal use. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of

Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

226. Defendant failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiff and Class Members, and as a result, Defendant was overpaid.

227. Under principles of equity and good conscience, Defendant should not be permitted to retain the money Plaintiff and Class Members paid it because Defendant failed to provide adequate safeguards and security measures to protect Plaintiff's and Class Members' Private Information, which Plaintiff and Class Members paid for but did not receive.

228. Defendant wrongfully accepted and retained these benefits—payment and Plaintiff's and Class Members' Private Information—and was enriched to the detriment of Plaintiff and Class Members.

229. Defendant's enrichment at Plaintiff's and Class Members' expense is unjust.

230. As a result of Defendant's wrongful conduct and resulting unjust enrichment, Plaintiff and Class Members are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendant, plus reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment as follows:

A. An Order certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B. Awarding Plaintiff and the Class damages that include applicable compensatory, actual, exemplary, and punitive damages, as allowed by law;

C. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

D. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

E. Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

F. Awarding attorneys' fees and costs, as allowed by law,

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiff and the Class leave to amend this complaint to request punitive damages, if appropriate, and/or to conform to the evidence produced at trial; and,

I. Any and all such relief to which Plaintiff and the Class are entitled.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: September 5, 2025

Respectfully submitted,

By: */s/ Gary M. Klinger*

Gary M. Klinger (IL Bar No. 6303726)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel : (866) 252-0878
gklinger@milberg.com

Jeff Ostrow (*pro hac vice* forthcoming)
**KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
ostrow@kolawyers.com
***Attorneys for the Plaintiff and Putative Class***